**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| OBAMA FOR AMERICA; | : | **Case No. 2:12cv00636** |
| DEMOCRATIC NATIONAL | : | |
| COMMITTEE; and | : | **Judge Peter C. Economus** |
| OHIO DEMOCRATIC PARTY | : | |
| | : | **Magistrate Judge Norah McCann King** |
| Plaintiffs, | : | |
| v. | : | |
| | : | |
| JON HUSTED, in his official capacity | : | |
| as Ohio Secretary of State and | : | **PLAINTIFFS' MOTION FOR** |
| MIKE DEWINE, in his official capacity | : | **PRELIMINARY INJUNCTION** |
| | : | **AND** |
| as Ohio Attorney General | : | **MEMORANDUM OF LAW IN** |
| | : | **SUPPORT** |
| Defendants. | : | |

**MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Obama for America, the Democratic National Committee, and the Ohio

Democratic Party hereby move this Court for a preliminary injunction to prevent the State

Defendants from arbitrarily denying tens of thousands of Ohio voters the right to cast their votes

in the three days prior to Election Day – a critical right that was granted to all qualified Ohio

voters in 2005, used by an estimated 93,000 Ohio voters in the 2008 presidential election, and

inequitably taken away from most, but not all, Ohio voters without justification in the last year.

As demonstrated below, and in the supporting Memorandum of Law, Plaintiffs are very likely to

succeed on their claims that  recent legislative changes to Ohio election law violate the Equal

Protection Clause of the United States Constitution; Plaintiffs' members and supporters –

Democratic voters who may not be able to vote if the right to vote early in person in the three

days prior to Election Day is taken away – will be irreparably harmed if an injunction does not

1

issue; the balance of hardships tips in Plaintiffs' favor; and a preliminary injunction restoring early voting in the three days prior to Election Day for all eligible Ohio citizens would be in the public interest.

As a result of a confused series of statutory maneuvers and "technical corrections" in the last year, Ohio election law now treats similarly situated Ohio voters differently with respect to the deadline for in-person early voting.  Following the passage of Amended Substitute House Bill 224 ("HB 224") and Substitute Senate Bill 295 ("SB 295"), voters using the Uniformed and Overseas Citizens Absentee Voter Act ("UOCAVA") are entitled to vote early up until the close of the polls on Election Day, pursuant to Ohio Rev. Code § 3511.10; non-UOCAVA voters, however, face a more restrictive deadline:  6 p.m. on the Friday before an election, pursuant to Ohio Rev. Code § 3509.03.  This disparate treatment, which results in a significant burden on the fundamental right to vote for non-UOCAVA voters, is entirely arbitrary.  The Ohio General Assembly failed to articulate any justification for this disparate treatment in the legislative record – an extraordinary omission given that the disparity was brought to the Assembly's attention through testimony.  Moreover, no legitimate justification can be discerned.  The three-day difference for in-person early voting is unrelated to voter qualifications.  Furthermore, even if there were an asserted justification, the relevant provisions must fall: They burden the fundamental right to vote but are not necessary to any sufficiently weighty state interest.  Finally, to the extent the disparity was motivated by a bare desire to obtain partisan advantage in the election contest, that motivation cannot justify the disparate treatment.  Nor can a simple drafting error.  In sum, Plaintiffs are likely to succeed on their claim that amendments made to Ohio Rev. Code § 3509.03 by HB 224 and SB 295, which eliminate the last three days of early voting prior

to Election Day for non-UOCAVA voters only, violate 42 U.S.C. § 1983 and the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

Moreover, thousands of Ohio voters, including many of Plaintiffs' members and supporters, will be irreparably harmed if a preliminary injunction does not issue.  It is well settled that an abridgement or dilution of the right to vote constitutes irreparable harm.  Here, the withdrawal from most, but not all, Ohio voters of the right to cast a ballot in the three days prior to Election Day places a significant burden on the right to vote.  This burden, once imposed, can never be undone.  Indeed, early voting – particularly in the three days prior to Election Day when early voting turnout is heavy – is critical to ensuring that voters are not disenfranchised by the long delays that plagued the 2004 presidential election.

In contrast, the State cannot demonstrate any hardship at all.  Any administrative issues would be minimal; Ohio has successfully administered early in-person voting in the three days prior to Election Day for five years.  Indeed, the absence of early voting in the three days prior to Election Day for most Ohio voters is likely to increase the administrative burden on the Ohio election system given the overcrowding that occurred in the 2004 presidential election before the early voting system was put in place.  To the extent there is any administrative inconvenience from the relief requested herein, it is far outweighed by the infringement of voters' constitutional rights.  Finally, it is well settled that protecting constitutional rights, as a preliminary injunction here would do, is always in the public interest.

In light of the foregoing and as set forth in the Proposed Order submitted herewith, Plaintiffs seek a preliminary injunction that would prohibit the Defendants from implementing or enforcing the HB 224 amendments to Ohio Rev. Code § 3509.03, specifically lines 863 and 864 of § 3509.03 (I) in HB 224, as well as the enactment of Ohio Rev. Code § 3509.03 with the HB

3

224 amendments by SB 295, thereby restoring in-person early voting on the three days immediately preceding Election Day for all eligible Ohio voters.

Respectfully submitted,

/s/ DONALD J. McTIGUE

_____
Donald J. McTigue (0022849)
Trial Counsel
Mark A. McGinnis (0076275)
J. Corey Colombo (0072398)
McTigue & McGinnis LLC
545 East Town Street
Columbus, Ohio 43215
Tel: (614) 263-7000
Fax: (614) 263-7078
dmctigue@electionlawgroup.com
mmcginnis@electionlawgroup.com
ccolombo@electionlawgroup.com

*Attorneys for Plaintiffs*

Robert F. Bauer*
Perkins Coie
700 Thirteenth Street, Suite 600
Washington DC 20005
Tele: 202-434-1602
Fax: 202-654-9104
RBauer@perkinscoie.com

*General Counsel for Plaintiffs Obama for*
*America and the Democratic National*
*Committee*

Jennifer Katzman*
Obama for America
130 East Randolph
Chicago, IL 60601
Tele: 312-985-1645
jkatzman@barackobama.com

*National Voter Protection Counsel*
*for Plaintiff Obama for America*

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION**

**SUMMARY TABLE OF CONTENTS**

I.      INTRODUCTION    1

II.     BACKGROUND    1

     A.     Amended Substitute House Bill Number 194    3

     B.     Amended Substitute House Bill Number 224    4

     C.     Substitute Senate Bill Number 295    5

     D.     Secretary of State's Advisory    6

     E.     Summary of Legislative Changes    8

III.    ARGUMENT    9

     A.     PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION    9

          1.     Plaintiffs Are Likely to Succeed on the Merits of Their Claim that Ohio's Arbitrary and Disparate Treatment of Voters, and The burden on the Fundamental Right to vote, Violate the Equal Protection Clause.    10

          a.     Ohio's elimination of the last three days of early in-person voting for most, but not all, Ohio voters constitutes arbitrary and disparate treatment that violates the Equal Protection Clause.    10

          b.     Ohio's elimination of the last three days of early in-person voting also violates the Equal Protection Clause because it burdens the fundamental right to vote for most, but not all, voters without a sufficiently weighty justification.    14

          2.     The Balance Of Hardships Tips Sharply In Favor Of Granting A Preliminary Injunction    17

          a.     Absent a preliminary injunction, Ohio's arbitrary and unequal system for early in-person voting will irreparably harm thousands of voters in the upcoming elections, including Plaintiffs' members and supporters    17

       b.    The harm to Defendants from issuance of an injunction will be non-existent or negligible    18

       3.    A Preliminary Injunction Would Be In The Public Interest    19

IV.    THIS COURT SHOULD ENJOIN DEFENDANTS FROM IMPLEMENTING AND ENFORCING LINES 863 AND 864 OF SEC. 3509.03 (I) IN HB 224, AS WELL AS THE SB 295 ENACTMENT OF OHIO REV. CODE § 3509.03 WITH THE HB 224 AMENDMENTS, AND SHOULD THEREBY RESTORE IN-PERSON EARLY VOTING ON THE THREE DAYS IMMEDIATELY PRECEDING ELECTION DAY FOR ALL ELIGIBLE OHIO VOTERS    20

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Am. Civil Liberties Union v. McCreary Cnty.,*
    354 F.3d 438 (6th Cir. 2003) .................................................................................................20

*Anderson v. Celebrezze,*
    460 U.S. 780 (1983).............................................................................................................15

*Burdick v. Takushi*
    504 U.S. 428 (1992).......................................................................................................10, 15

*Bush v. Gore*
    531 U.S. 98 (2000 ...............................................................................................................11

*Citizens United v. Fed. Election Comm'n,*
    130 S. Ct. 876, 895 (2010) .................................................................................................12

*Connection Distrib. Co. v. Reno,*
    154 F.3d 281 (6th Cir. 1998) ................................................................................................9

*Crawford v. Marion Cnty. Election Bd.,*
    553 U.S. 181 (2008) (plurality opinion) ..................................................................... passim

*Dillard v. Crenshaw Cnty.,*
    640 F. Supp. 1347 (M.D. Ala. 1986) ..................................................................................18

*Dunn v. Blumstein,*
    405 U.S. 330 (1972).............................................................................................................11

*Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,*
    274 F.3d 377 (6th Cir. 2001) .................................................................................10, 18, 19

*Harper v. Va. St. Bd. of Elections,*
    383 U.S. 663 (1966).............................................................................................................10

*Hunter v. Hamilton Cnty. Bd. of Elections,*
    635 F.3d 219 (6th Cir. 2011) ...........................................................................9, 11, 14, 19

*Johnson v. Halifax Cnty.,*
    594 F. Supp. 161 (E.D. N.C. 1984)....................................................................................19

*League of Women Voters of Ohio v. Brunner,*
    548 F.3d 463 (6th Cir. 2008) ...................................................................................... passim

*Mayhew v. Cohen,*
    604 F. Supp. 850 (E.D. Pa. 1984) ........................................................................................20

*Miller v. Blackwell,*
    348 F. Supp. 2d 916 (S.D. Ohio 2004) ...............................................................................18

*NAACP State Conference v. Cortes,*
    591 F. Supp. 2d 757 (E.D. Pa. 2008) ..................................................................................16

*NAACP-Greensboro Branch v. Guilford Cntty. Bd. of Elections,*
    No. 1:12CV111, 2012 U.S. Dist. LEXIS 34353 (M.D.N.C. March 14, 2012) ....................19

*O'Brien v. Skinner,*
    414 U.S. 524 (1974) .......................................................................................................11, 14

*Overstreet v. Lexington-Fayette Urban Cnty. Gov't,*
    305 F.3d 566 (6th Cir. 2002) ..............................................................................................17

*Perry v. Judd,*
    No. 3:11-CV-856, 2012 U.S. Dist. LEXIS 4290 (E.D. Va. Jan. 13, 2012) ...........................20

*Reynolds v. Sims,*
    377 U.S. 533 (1964) .......................................................................................................11, 17

*Spencer v. Blackwell,*
    347 F. Supp. 2d 528 (S.D. Ohio 2004) ..........................................................................18, 19

*Sw. Voter Registration Educ. Project v. Shelley,*
    344 F.3d 882 (9th Cir. 2003) ..........................................................................................17, 20

*United States v. Berks Cnty., Pa.,*
    250 F. Supp. 2d 525 (E.D. Pa. 2003) ..................................................................................19

*Wesberry v. Sanders,*
    376 U.S. 1 (1964) ................................................................................................................10

*Williams v. Salerno,*
    792 F.2d 323 (2d Cir. 1986) ...............................................................................................17

*Winter v. Natural Res. Def. Council,*
    55 U.S. 7 (2008) ....................................................................................................................9

**STATUTES**

Ohio Rev. Code § 3505.181 ..........................................................................................................3

Ohio Rev. Code § 3509.01 ...................................................................................................3, 4, 6

Ohio Rev. Code § 3509.03 ..................................................................................... *passim*

Ohio Rev. Code § 3511.02 ...............................................................................5, 6, 13

Ohio Rev. Code § 3511.01 ...............................................................................................4

Ohio Rev. Code § 3511.10 ...........................................................................5, 6, 7, 13

Pub. L. No. 99-410, 100 Stat. 924 (1986) .......................................................................4

**OTHER AUTHORITIES**

Sen. Niehaus Statement on Repeal of Election Reform Bill (Feb. 9, 2012), available at
http://www.ohiochannel.org/MediaLibrary/Media.aspx?fileId=134410 .................................5

United States Constitution, Fourteenth Amendment ...................................................2, 10, 14, 19

<u>MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION</u>

## I.  INTRODUCTION

Ohio has considerable discretion in how to set up its voting process, but it cannot

arbitrarily treat similarly situated voters differently.  Between 2005 and 2011, Ohio granted all

eligible voters the right to vote early, up until 6 p.m. on the Monday before Election Day.  This

early voting system, which was successfully administered for five years and ameliorated the

significant delays that occurred in the 2004 presidential election, resulted in increased voter

participation, including among those for whom it is a hardship to vote on Election Day because

of work or family obligations.  Indeed, 93,000 Ohio citizens voted in the last three days before

the 2008 presidential election.

In the last year, however, through a confused series of statutory maneuvers and "technical

corrections," a Republican-dominated General Assembly shortened the early voting period for

some, but not all voters, by taking away most voters' opportunity to vote early in person in the

three days prior to Election Day.  This disparate treatment is entirely arbitrary.  Even if there

were a legitimate justification for the disparity, the State has not articulated, and cannot articulate

a sufficient basis to outweigh the infringement on Ohio voters' constitutional rights.  Because

this unequal abridgment of the fundamental right to vote will cause irreparable harm to the

affected voters, and the public interest favors protecting constitutional rights, a preliminary

injunction should issue against the offending statutory provisions.

## II.  BACKGROUND

Ohio has a history of troubled elections.  The 2004 Presidential election earned the State

widespread notoriety for its seven-hour lines to vote, machine shortages and malfunctions, and a

1

wide assortment of other problems that led to the disenfranchisement of thousands of voters.  *See*
Declaration of Donald J. McTigue ("McTigue Decl."), Ex. 1 (American Civil Liberties Union of
Ohio Testimony (May 10, 2011) (noting that legislative changes were made to address the long
lines from 2004).  As recounted by the Sixth Circuit in *League of Women Voters of Ohio v.
Brunner*, 548 F.3d 463 (6th Cir. 2008), it was alleged that:

> Voters were forced to wait from two to twelve hours to vote because of inadequate
> allocation of voting machines. . . . [In] at least one polling place, voting was not
> completed until 4:00 a.m. on the day following election day.  Long wait times caused
> some voters to leave their polling places without voting in order to attend school, work,
> or to family responsibilities or because a physical disability prevented them from
> standing in line. . . . If true, these allegations could establish that Ohio's voting system
> deprives its citizens of the right to vote or severely burdens the exercise of that right
> depending on where they live in violation of the Equal Protection Clause.

*Id.* at 477-78.

To address problems arising from the 2004 election, Ohio established no-fault absentee
voting.  *See* Substitute House Bill 234, 126th General Assembly (October 19, 2005).  The law
allows voters to request an absentee ballot without stating a reason.  *Id.*  Although voters are
permitted to cast their ballots by mail, they also have the option of voting in person at a Board of
Elections office or other site designated by the Board of Elections prior to Election Day.  *Id.*

In subsequent elections, early voting increased significantly and a large number of voters
took advantage of the option to cast their absentee ballots in person at the office of, or a site
designated by, a county Board of Elections.  *See* McTigue Decl., Ex. 2 at 2 (Ray C. Bliss
Institute of Applied Politics at University of Akron, *A Study of Early Voting in Ohio*).  Of the
many people who voted early in person, a significant percentage of those did so within one week
of Election Day, making it the largest period of early voting.  *Id.*  Indeed, an estimated 93,000
Ohioans voted in the three days prior to the 2008 presidential election.  *See* McTigue Decl., Ex. 3

(Data Compiled by Norman Robbins at Northeast Voter Advocates, *Elections are About Voters, but Legislative Measure Under Consideration Ignores Voting Preferences*). Those who voted early were more likely to be women, older and lower income than election-day voters – groups that tend to favor Democratic candidates. *See* McTigue Decl., Ex. 3 at 2, 14-16.

### A. Amended Substitute House Bill Number 194

Notwithstanding the great success of early voting in Ohio, in July 2011, Governor Kasich signed into law Amended Substitute House Bill Number 194 ("HB 194"), an omnibus election law bill. HB 194, 129th General Assembly (June 29, 2011). Among other things, HB 194 eliminated the last three days of early voting. Ohio Rev. Code § 3509.01 (later amended).[1] Votes in both the House and the Senate split along party lines, with Republicans voting in favor of the bill and Democrats against it.

Immediately after HB 194 was enacted, a broad coalition of legislators, voting rights advocates, and organizations began gathering signatures to put the measure to a referendum. *See* McTigue Decl., Ex. 4 (Terri L. Enns, *Thoughts on HB 194 and Ohio's Referendum Process*, (April 3, 2012), available at http://moritzlaw.osu.edu/electionlaw/comments/index.php?ID=9075 (last visited July 14, 2012)). Under Article II, Section 1 of the Ohio Constitution, the people of Ohio have the power to "adopt or reject [general assembly laws] at the polls on a referendum vote." The referendum drive was more than successful: Supporters needed 231,150 voters to sign the petition, but they were able to amass over 300,000 signatures. *See* McTigue Decl., Ex. 5 (Press Release, *Secretary of State Husted Certifies HB 194 Referendum Petition Signatures*,

---

[1] The bill, which had an effective date of September 30, 2011, also contained other measures limiting voters' rights. For example, the bill eliminated the requirement that poll workers direct voters to the correct precinct and inform them that their ballots are not counted if they vote at an incorrect location. Ohio Rev. Code § 3505.181 (later amended). Furthermore, it prohibited boards of elections from mailing absentee voter forms to voters or paying the return postage on such forms. Ohio Rev. Code § 3509.03 (later amended).

dated December 9, 2011).  In addition, they were required to collect signatures from at least

forty-four of Ohio's eighty-eight counties, and within each of those counties to collect signatures

equal to three percent of the total vote cast for governor in the 2010 gubernatorial election; and

yet they were able to meet or exceed the three percent threshold in 64 counties.  *Id*.  On

December 9, 2011, the Secretary of State certified the referendum.  *Id.*  As a result, HB 194 does

not become effective unless a majority of the electors approve it.  Ohio Const., art. II, § 1.  The

referendum is expected to be on the ballot in November 2012.

**B.  Amended Substitute House Bill Number 224**

In the interim period while signatures on the referendum were being gathered, yet another

election law bill was passed:  Amended Substitute House Bill Number 224 ("HB 224") was

signed by Governor Kasich on July 27, 2011.  HB 224, 129th General Assembly (July 13, 2011).

Although the bill focused primarily on easing the burdens on absent military and overseas voters

subject to the Uniformed and Overseas Absentee Voting Act ("UOCAVA")[2], another purpose of

HB 224 was "to make technical corrections to the laws governing elections."  *Id.*

Technical corrections were necessary because, as a result of legislative oversight in HB

194, two sections of the Ohio Revised Code dealing with the deadline for in-person early voting

for non-UOCAVA voters were inconsistent with each other.  *Compare* Ohio Rev. Code §

3509.01 (later amended) *with* Ohio Rev. Code § 3509.03.  HB 194 had added language to Ohio

---

[2]    This federal statute requires states to ensure that members of the military and citizens living
overseas have the right to vote absentee in federal elections, Pub. L. No. 99-410, 100 Stat. 924 (1986)
(codified in scattered sections of 18 U.S.C., 39 U.S.C., and 42 U.S.C.).  According to Ohio Rev. Code §
3511.01, uniformed services voters includes: active and reserve members of the army, navy, air force,
marine corps, and coast guard; members of the merchant marine, commissioned corps of public health
service, commissioned corps of the national oceanic and atmospheric administration, national guard, and
organized militia; and the spouses or dependents of any of the above.  This category includes people who
may reside in Ohio year round.

4

Rev. Code § 3509.01 ending the in-person early voting period for non-UOCAVA voters on the Friday before the election at 6 p.m.  HB 194, 129th General Assembly (June 29, 2011). However, the General Assembly did not change the language in another provision, Ohio Rev. Code § 3509.03; that provision set the end time for in-person early voting at close of business the day before an election.  HB 224 included technical amendments to Ohio Rev. Code § 3509.03 to bring this provision of the Code in line with HB 194, *i.e.*, it moved the deadline to Friday at 6 p.m.  *See* HB 224, 129th General Assembly (July 13, 2011).

HB 224 also included technical corrections related to the deadline for early in-person voting by UOCAVA voters.  *Id.*  HB 194 had apparently sought to change the in-person early voting deadline for UOCAVA voters to be the Friday before the election as well, by amending Ohio Rev. Code § 3511.10.  However, it did not amend Ohio Rev. Code § 3511.02, which permitted in-person early voting by UOCAVA voters through the day before the election.  In HB 224, the Ohio General Assembly included a technical correction to Ohio Rev. Code § 3511.02 to also shorten the deadline for UOCAVA voters to the Friday before the election.[3]  *Id.*

### C.  Substitute Senate Bill Number 295

In January 2012, the Secretary of State and Republican Members of the General Assembly announced a plan to repeal HB 194 while it was awaiting a referendum by the people, an unprecedented action in Ohio.  Senate President Tom Niehaus informed the public that the Senate planned to repeal the bill and then replace it with a new bill that would include many of the same provisions and restrictions. *See* Sen. Niehaus Statement on Repeal of Election Reform

---

[3]      Despite the fact that HB 224 imposed similar restrictions on early voting as those contained in HB 194, HB 224 was not subject to referendum because it was enacted as an emergency bill and thus was exempt under Article II, Section 1(d) of the Ohio Constitution.

Bill (Feb. 9, 2012), available at

http://www.ohiochannel.org/MediaLibrary/Media.aspx?fileId=134410 (last visited July 12,

2012).  The repeal bill, Substitute Senate Bill Number 295 ("SB 295"), was passed by the

General Assembly on May 8, 2012 and signed by the Governor on May 15, 2012.  SB 295, 129th

General Assembly (May 8, 2012).

     Although SB 295 effectively repealed the changes made to the in-person early voting

deadlines by HB 194 by eliminating the new more restrictive language added by HB 194 to Ohio

Rev. Code § 3509.01, it did not repeal the conforming changes made by HB 224 to Ohio Rev.

Code §§ 3509.03 and 3511.02.  *Id.*  As a result, following the passage of HB 224 and SB 295,

one early voting deadline exists for non-UOCAVA voters:  6 p.m. on the Friday before an

election.  Ohio Rev. Code § 3509.03 (as amended by HB 224).  But two deadlines exist for

UOCAVA voters:  6 p.m. on the Friday before an election, Ohio Rev. Code § 3511.02 (as

amended by HB 224) and the close of the polls on Election Day, Ohio Rev. Code § 3511.10

(following the repeal of HB 194 by SB 295).[4]

     Concerns about creating two classes of voters with different access to the polls were

raised several times through legislative testimony.  For example, Carrie L. Davis, Executive

Director of the League of Women Voters of Ohio, brought it to the General Assembly's attention

in her legislative testimony on March 21, 2012.  *See* McTigue Decl., Ex. 7 (Carrie L. Davis

Testimony (March 21, 2012).  Davis explained the history of HB 194 and HB 224 and the

confusion that resulted from the conflicting provisions.  She warned the General Assembly,

"Passing a straight repeal of provisions that were only in HB 194 without addressing the

---

[4]    A chart summarizing these legislative changes is attached to the McTigue Declaration as Exhibit 6.

'technical changes' made in HB 224 continues the inconsistency problem, wherein sections of the voting law conflict with one another." *Id.* The General Assembly chose not to address these issues; it also provided no justification for its decision.

### D. Secretary of State's Advisory

Even before the passage of SB 295, however, it was clear that there would be conflicting deadlines for in-person early voting if the referendum petition on HB 194 was successful (and the effective date of HB 194 was suspended as a result). On October 14, 2011, Defendant Husted issued Advisory 2011-07 to the County Boards of Elections, in part to address conflicting early voting deadlines. *See* McTigue Decl., Ex. 8 (Defendant Husted's October 14, 2011 Advisory). According to the Advisory: "In-person absentee voting ends at 6 p.m. the Friday before the election for non-uniformed military and overseas voters. Ohio Rev. Code 3509.03." McTigue Decl., Ex. 8 at 2. The Advisory provided a different end time for UOCAVA voters. It noted that those "voters may vote in-person absentee until the close of the polls on the day of the general or primary election. They must vote at the board of elections office between 6 p.m. the Friday before the election and the close of the polls on the day of the election. Ohio Rev. Code 3511.10."[5] *Id.* In essence, the Secretary of State appropriately resolved the conflict between the two in-person early voting deadlines for UOCAVA voters in favor of the more generous time period.[6] Subsequent efforts by local boards of elections to extend the in-person early voting deadline for non-UOCAVA voters to the Monday before the election were all denied by the Secretary of State, on the ground that Ohio Rev. Code § 3509.03 prohibited him from

---

[5]    The Advisory was issued after HB 194 was stayed by referendum and remained in effect after SB 295 repealed HB 194.

[6]    Because the referendum on HB 194 and the repeal of 194 by SB 295 have the same practical effect, the Advisory remains in effect.

authorizing voting during this window of time for non-UOCAVA voters. *See* McTigue Decl.,

Ex. 9 (Letter sent by Defendant Husted to the Director and Deputy Director of the Montgomery

County Board of Elections (October 25, 2011)); McTigue Decl., Ex. 10 (Letter sent by

Defendant Husted to the Director of the Darke County Board of Elections (October 27, 2011)).

Similar legislative efforts, sponsored by Democrats, to restore early voting for non-UOCAVA

voters in the three days prior to the election were all defeated by the Republican-controlled

majority in both houses of the General Assembly, with all but one vote falling along party lines.

*See* McTigue Decl., Ex. 11 (Amendment to reinstitute absent voting on weekends and the

Monday before an election, reported by House State Government and Elections regarding

Substitute Senate Bill 295).

**E. Summary of Legislative Changes**

In sum, in the past year, the in-person early voting system has been changed in the

following ways:

- Before the General Assembly passed HB 194, non-UOCAVA and UOCAVA voters shared the same deadline for in-person early voting. Essentially, both groups of voters could vote early in-person through the Monday before Election Day. UOCAVA voters also had the option on Election Day of voting either at the polls or at their board of elections office. This latter provision regarding Election Day voting is not at issue in this litigation.

- HB 194 attempted to significantly shorten the early voting period by establishing a new deadline of 6 p.m. on the Friday before Election Day. Although HB 194 added new language to accomplish this goal, the General Assembly failed to make appropriate changes to two other applicable sections, creating inconsistencies in the deadline for in-person early voting for both UOCAVA and non-UOCAVA voters.

- HB 224 corrected the legislative oversight in HB 194 and made all four provisions dealing with early voting consistent. Thus, it set a deadline of 6 p.m. on the Friday before Election Day for the two sections not addressed in HB 194 for both UOCAVA and non-UOCAVA voters.

8

- A referendum petition was filed on September 29, 2011, and as a result, the provisions addressing the early voting deadline in HB 194 were put on hold. Thus, any changes made in HB 194 were reset to their pre-HB 194 state. However, HB 224 was still in effect. Thus, the technical corrections made in HB 224 no longer served their purpose of creating consistency among all four provisions for in-person early voting. Indeed, the 224 provisions, standing alone, created inconsistency again. Non-UOCAVA voters were left with a deadline of 6 p.m. on Friday. Two provisions applied to UOCAVA voters: Friday at 6 p.m. and the close of polls on Monday (with the additional option to vote in-person at a board of elections office on Election Day).

- Before Ohio voters could vote on the HB 194 referendum, SB 295 was passed by the General Assembly repealing HB 194 and enacting the early voting sections as amended by HB 224. Thus, the end result was non-uniform deadlines for the cut-off of in-person early voting.

- Prior to the passage of SB 295, Defendant Husted issued an advisory on how to harmonize the referendum on HB 194 with the provisions in HB 224. The advisory directed the local boards of elections to limit in-person early voting for non-UOCAVA voters to 6 p.m. the Friday before Election Day, but to allow UOCAVA voters to vote early in person through the Monday before Election Day (with the additional option to vote in person at a board of elections office on Election Day). In essence, the Secretary of State appropriately resolved the conflicting provisions applicable to UOCAVA voters in favor of the more generous time frame, but was constrained by the HB 224 amendments to Ohio Rev. Code § 3509.03 to apply a more restrictive deadline to non-UOCAVA voters.

*See* McTigue Decl., Ex. 6.

As a result of this convoluted legislative history, two similarly situated groups of Ohio voters are now treated differently with respect to the deadline for in-person early voting. This disparate treatment makes it likely that some voters, who now cannot vote early in person over the weekend before Election Day, may not be able to vote at all, because of work or family obligations or transportation challenges. *See* McTigue Decl., Ex. 12 (legislative testimony of Eric Marshall, Manager of Legal Mobilization of the Lawyers' Committee for Civil Rights Under Law (May 10, 2011)).

9

### III. ARGUMENT

### A.  PLAINTIFFS ARE ENTITLED TO A PRELIMINARY INJUNCTION

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 20 (2008); *see also Hunter v. Hamilton Cnty. Bd. of Elections,* 635 F.3d 219, 233 (6th Cir. 2011).  Plaintiffs satisfy each of these criteria.  Indeed, infringement of a constitutional right generally constitutes irreparable injury.  *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).  In addition, because plaintiffs "show a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment[,]" and "it is always in the public interest to prevent violation of a party's constitutional rights." *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,* 274 F.3d 377, 400 (6th Cir. 2001) (citation omitted).

### 1.  PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIM THAT OHIO'S ARBITRARY AND DISPARATE TREATMENT OF VOTERS, AND THE BURDEN ON THE FUNDAMENTAL RIGHT TO VOTE, VIOLATE THE EQUAL PROTECTION CLAUSE.

Plaintiffs will very likely succeed on their claim that the changes in Ohio law governing early voting violate the Equal Protection Clause.  The laws effectively create two classes of Ohio voters: one group may vote in the three days prior to Election Day; the other group may not.  This disparate treatment of voters is arbitrary: The State has provided no justification, and no discernible justification exists.  Furthermore, even if there were an asserted justification, the

10

relevant provisions must fall: They burden the fundamental right to vote but are not necessary to any sufficiently weighty state interest.

>   **a.  Ohio's elimination of the last three days of early in-person voting for most, but not all, Ohio voters constitutes arbitrary and disparate treatment that violates the Equal Protection Clause.**

"It is beyond cavil that voting is of the most fundamental significance under our constitutional structure." *Burdick v. Takushi,* 504 U.S. 428, 433 (1992) (citation and internal quotation marks omitted).  "No right is more precious," *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964), since the right to vote is "preservative of all rights." *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 476 (6th Cir. 2008) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); citing *Harper v. Va. St. Bd. of Elections*, 383 U.S. 663, 670 (1966)).  Indeed, the "right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

The fundamental right to vote is not limited to "the initial allocation of the franchise," but includes "the manner of its exercise." *Hunter*, 635 F.3d at 234 (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)).  "[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972).  Of course, states have substantial latitude to design and administer their elections; for example, they may choose to allow or not to allow early voting.  But "[h]aving once granted the right to vote on equal terms, the State may not, by later *arbitrary and disparate* treatment, value one person's vote over that of another." *Hunter*, 635 F.3d at 234 (quoting *Bush,* 531 U.S. at 104-05) (emphasis added)).  In short, "state actions in election processes must not result in arbitrary

11

and disparate treatment of votes." *Id.* (internal quotations omitted); *see also League of Women Voters,* 548 F.3d at 477 ("At a minimum, . . . equal protection requires nonarbitrary treatment of voters." (citation and internal quotation marks omitted)).  This principle applies with full force in the context of absentee voting. *See O'Brien v. Skinner*, 414 U.S. 524 (1974).[7]

Here, Ohio's actions unquestionably result in disparate treatment of voters.  In passing HB 224 and SB 295, the Ohio legislature withdrew from the majority of Ohio citizens a previously conferred right to vote in a particular manner – specifically, the right to cast a ballot in the three days immediately preceding an election.  And it did so while leaving that right intact for UOCAVA voters.  This disparate treatment is significant.  As the Supreme Court has acknowledged, the days immediately preceding an election are critical for participation.  "It is well known that the public begins to concentrate on elections only in the weeks immediately before they are held," *Citizens United v. Fed. Election Comm'n,* ___ U.S. ___, 130 S. Ct. 876, 895 (2010).  Ohio's disparate treatment of voters is arbitrary.  The State has provided no justification for its decision to withdraw from only one class of voters the last three days of early voting.  The statutory text contains no justification; nor do the Committee Reports or the subsequent Secretary of State analysis.  This failure is striking, given that the legislature heard testimony highlighting the problem of disparate treatment resulting from the legislature's maneuvers.

---

[7]     *O'Brien* involved a challenge brought by detainees in New York jails and pretrial detention facilities who, though eligible to vote, did not qualify for absentee balloting; at the time, New York law required absentee voters to be actually absent from their ordinary counties of residence.  The peculiar effect of this requirement was that individuals incarcerated in their ordinary counties of residence were ineligible to vote absentee, while detainees in facilities in other counties *were* eligible for absentee ballots. The Court found the distinction arbitrary and irrational, explaining that "New York's election statutes, as construed by its highest court, discriminate between categories of qualified voters in a way that, as applied to pretrial detainees and misdemeanants, is wholly arbitrary."  *O'Brien,* 414 U.S. at 530.

In addition, there is no discernible rational basis for the disparate treatment.  First, the distinction is not based on voter qualifications.  It is uncontroverted that the voters for whom the last three days of early voting was eliminated are otherwise qualified to vote.  *See Crawford v. Marion Cnty. Election Bd.,* 553 U.S. 181, 189 (2008) (plurality opinion) ("[E]ven rational restrictions on the right to vote are invidious if they are unrelated to voter qualifications.").

Second, the difference between UOCAVA and non-UOCAVA voters provides no justification for applying a different, more restrictive deadline to non-UOCAVA voters.  Of course, overseas voters should be treated differently from non-overseas voters.  Indeed, UOCAVA itself represents a response to the special difficulties that confront members of the military stationed away from their home counties and other overseas citizens.  It was enacted to facilitate absentee voting by a group of citizens who are often not present in the area in which they vote.  But here, the laws at issue govern only *in-person* early voting, and there is no reason why all voters should not have the benefit of the extra three days.  Moreover, any suggestion that the current scheme was designed to benefit UOCAVA voters is undermined by what the legislature actually did in enacting the three bills at issue.  In amending its election laws, it also created two different, and conflicting, deadlines for UOCAVA voters: 6 p.m. on the Friday before an election, Ohio Rev. Code § 3511.02 (as amended by HB 224), and the close of the polls on Election Day, Ohio Rev. Code § 3511.10 (following the repeal of HB 194 by SB 295).  The enactment of a more restrictive deadline for UOCAVA voters as well demonstrates that the disparate treatment is not justified by some interest in protecting the voting rights of UOCAVA voters.

Finally, to the extent the disparity was motivated by a bare desire to obtain partisan advantage in the election contest, that motivation cannot justify the disparate treatment.  Early voting in Ohio has been most prevalent among groups of voters believed to vote Democratic, s*ee* McTigue Decl. Ex. 3, including women, the elderly, and those with lower levels of income and education.  But a voting restriction motivated in part by partisan considerations must also have an independently sufficient justification to survive.  *See Crawford,* 553 U.S. at 203 ("It is fair to infer that partisan considerations may have played a significant role in the decision to enact SEA 483 [the Indiana photo ID law].  If such considerations had provided the only justification for a photo identification requirement, we may also assume that SEA 483 would suffer the same fate as the poll tax at issue in *Harper."*).  And on the flip side, if the disparity was created because of pure error – and not because of partisan animus – that only highlights the arbitrary nature of the restriction on early voting.

In short, the arbitrary elimination of the last three days of early voting for a class of Ohio voters cannot survive Equal Protection review.  The Constitution does not expressly protect the right to vote early or absentee, but because Ohio has made those voting mechanisms available, it cannot then deny them to some of its citizens on an arbitrary basis.  *See Hunter*, 635 F.3d at 234; *O'Brien*, 414 U.S. at 530; *League of Women Voters*, 548 F.3d at 477.  Indeed, Defendant Husted appears to recognize the importance of this principle.  In a press release regarding the mailing of absentee ballots by boards of elections, Defendant Husted stated: "Uniformity in the way in which Ohio's elections are administered is of the utmost importance, which is why Ohio must have a standardized approach to administering elections that ensures equal access for all voters." *See* Secretary of State Husted Press Release, *Statement by Secretary of State Husted Regarding*

14

*Uniformity of Voter Outreach by Boards of Elections* (dated August 22, 2011) (attached as

McTigue Decl. Ex. 13).  Plaintiffs agree.

      **b.**    **Ohio's elimination of the last three days of early in-person voting also violates the Equal Protection Clause because it burdens the fundamental right to vote for most voters without a sufficiently weighty justification.**

Even if the disparate treatment here were not wholly arbitrary, plaintiffs would be very

likely to succeed on the merits of their Equal Protection Claim because Ohio cannot provide

reasons sufficiently weighty to justify the significant burden on the fundamental right to vote for

most, but not all, Ohio voters.  The Supreme Court has set forth a balancing test for evaluating

the permissibility of a state regulation that burdens the right to vote.  Under that balancing test,

"[a] court considering a challenge to a state election law must weigh 'the character and

magnitude of the asserted injury'" against "'the precise interests put forward by the State as

justifications for the burden imposed by its rule,' taking into consideration 'the extent to which

those interests make it necessary to burden the plaintiff's rights.'"  *Burdick*, 504 U.S. at 434

(quoting *Anderson v. Celebrezze,* 460 U.S. 780, 789 (1983)).  Furthermore, as the Court has

explained, "even rational restrictions on the right to vote are invidious if they are unrelated to

voter qualifications." *Crawford,* 553 U.S. at 189.  "[H]owever slight [a] burden [on the right to

vote] may appear . . . it must be justified by relevant and legitimate state interests 'sufficiently

weighty to justify the limitation.'" *Id*. at 191 (quoting *Norman v. Reed,* 502 U.S.279, 288-89

(1992)).

Recent experience in Ohio confirms that the burden on the right to vote imposed by the

withdrawal of early voting for most, but not all, Ohio voters is significant.  In 2008, nearly thirty

percent of votes were cast early, either in person or by mail, and in 2010 the figure was nearly twenty-six percent. *See* McTigue Decl., Ex. 2 at 2. In 2010, 29.6% of those casting early in-person or by mail votes did so within one week of Election Day. *Id.* at 5. It is estimated that in 2008, nearly *93,000 voters* cast their ballots in person in just the three days immediately preceding the election. *See* McTigue Decl., Ex. 3. Moreover, in testimony before the Ohio House of Representatives, Eric Marshall of the Lawyers' Committee for Civil Rights Under Law explained that early in-person voting in Ohio has led to the enfranchisement of "people who otherwise might not vote at all, including those voters that have real difficulty getting to the polls on Election Day due to job or family commitments or transportation problems." *See* McTigue Decl., Ex. 12. Marshall also noted that such "[e]arly voting . . . provides critical relief to ease congestion and burdens at the polls on Election Day," which is crucially important in light of Ohio's "history of long lines and Election Day confusion and break downs." *Id.*

The fact that Ohioans may still vote early at a different time, or on Election Day itself, does not remedy the constitutional violation. Indeed, courts have invalidated election regulations that did not constitute complete denials of the right to vote, where the burden was deemed sufficiently severe. *See League of Women Voters,* 548 F.3d at 466 (finding that plaintiffs had successfully stated a claim that "Ohio's voting system is so deficient as to deny or severely burden their fundamental right to vote"); *see also NAACP State Conference v. Cortes*, 591 F. Supp. 2d 757, 764 (E.D. Pa. 2008) (concluding that at a certain point, "the burden of standing in a queue ceases to be an inconvenience or annoyance and becomes a constitutional violation because it, in effect, denies a person the right to exercise his or her franchise"). Weekends are often the most convenient time to vote; indeed, they are the only times certain people will

realistically be able to vote.  And the ability to vote in person on one of the earlier weekends is not a meaningful alternative for those who wish to vote later; particularly in national contests, major developments are common in the days immediately preceding an election, and the right to vote before the campaign has run its course is a significantly diminished right.

Ohio cannot show that the burden it has imposed is justified by "relevant and legitimate state interests sufficiently weighty to justify the limitation." *Crawford*, 553 U.S. at 191; *see also Anderson*, 460 U.S. at 789.  As discussed above, the deprivation of the three days of early voting is "unrelated to voter qualifications," *see Crawford*, 553 U.S. at 189; and both partisan motivation and legislative error are not permissible justifications.  Furthermore, Ohio's burden on the right to vote does not serve any legitimate regulatory interest in ensuring that "some sort of order, rather than chaos, is to accompany the democratic processes."  *Burdick*, 504 U.S. at 433 (quoting *Storer v. Brown*, 415 U.S. 724, 730 (1974)).  To the contrary, against the backdrop of Ohio's troubled history of election administration and the widespread reliance on the ability to vote in the three-day pre-election period in recent election cycles, and in light of the conflicting deadlines that now exist, the change is highly likely to cause greater chaos.  Thus, not only does the burden imposed by Ohio significantly impair the right to vote of many Ohio citizens to vote without a sufficiently weighty reason, the concerns raised by the scheme are magnified by the likelihood that, if this restriction stands, election-day resources will again be strained in ways almost certain to result in further chaos and disenfranchisement.

For the foregoing reasons, Plaintiffs are likely succeed on the merits of their claim that the Ohio legislature's withdrawal of the right to vote in the immediate pre-election period,

17

without justification and in light of the longer time available for UOCAVA voters, deprives Ohio citizens of the equal protection of the laws.

      **2.**    **The Balance Of Hardships Tips Sharply In Favor Of Granting A Preliminary Injunction**

          **a.**    **Absent a preliminary injunction, Ohio's arbitrary and unequal system for early in-person voting will irreparably harm thousands of voters in the upcoming elections, including Plaintiffs' members and supporters.**

"[A] plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights." *Overstreet v. Lexington-Fayette Urban Cnty. Gov't,* 305 F.3d 566, 578 (6th Cir. 2002).  As noted above (*see* Part IIIA(1)(a), *supra*), the right to vote is fundamental.  Indeed, it is of the most fundamental significance under our constitutional structure.  *See Reynolds v. Sims*, 377 U.S. 533, 555 (1964).  Courts have consistently held that an abridgement or dilution of the right to vote constitutes irreparable harm. *See Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 882, 907 (9th Cir. 2003) ("Abridgement or dilution of a right so fundamental as the right to vote constitutes irreparable injury.") (citation and internal quotation marks omitted); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) (the denial of the fundamental right to vote is unquestionably "irreparable harm"); *Miller v. Blackwell*, 348 F. Supp. 2d 916, 922 (S.D. Ohio 2004) (Dlott, J.) ("Because this Court has found that the Defendants' challenged actions threaten to impair both Plaintiffs' constitutional right to due process and constitutional right to vote, the Court must find that Plaintiffs will suffer an irreparable injury if the temporary restraining order does not issue.").

Here, the withdrawal from most, but not all, Ohio voters of the right to cast a ballot in the three days immediately preceding an election places a significant burden on the right to vote. This burden, once imposed, can never be undone.  And "[g]iven the fundamental nature of the

right to vote, monetary remedies would obviously be inadequate [to remedy the violation]; it is simply not possible to pay someone for having been denied a right of this importance." *Dillard v. Crenshaw Cnty.,* 640 F. Supp. 1347, 1363 (M.D. Ala. 1986).  Because countless Ohio voters, including many members and supporters of Plaintiffs' organizations, are likely to suffer irreparable harm in the absence of preliminary relief, this prong of the analysis weighs heavily in favor of granting a preliminary injunction.

> **b.    The harm to Defendants from issuance of an injunction will be non-existent or negligible.**

In stark contrast to the severe and irreparable harm that Plaintiffs will face if no preliminary injunction is granted, Defendants cannot show that they will suffer any significant harm if the requested injunction issues.  Because Plaintiffs "show[] a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere in its enjoinment." *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,* 274 F.3d 377, 400 (6th Cir. 2001); *Spencer v. Blackwell*, 347 F. Supp. 2d 528, 538 (S.D. Ohio 2004) (same).  Put differently, given the importance of the right to vote, even if a preliminary injunction were to create any administrative inconvenience, such minimal burden would not justify the denial of injunctive relief.  *See, e.g.*, *United States v. Berks Cnty., Pa.*, 250 F. Supp. 2d 525, 541 (E.D. Pa. 2003) ("Although these reforms may result in some administrative expenses for Defendants, such expenses are likely to be minimal and are far outweighed by the fundamental right at issue") (citing *Johnson v. Halifax Cnty.*, 594 F. Supp. 161, 171 (E.D.N.C. 1984) ("administrative and financial burdens on defendant not undue in light of irreparable harm caused by unequal opportunity to participate in county election")).  In short, the harm to Defendants from issuance of an injunction will be non-existent or negligible.  Ohio has

successfully administered early in-person voting in the three days before Election Day for five years; indeed, the absence of early in-person voting during this period in the next election is likely to increase, not decrease, the administrative burden of administering Ohio's election system.  The balance of hardships, therefore, weighs heavily in favor of Plaintiffs.

### 3.  A Preliminary Injunction Would Be In The Public Interest.

 "[I]t is always in the public interest to prevent violation of a party's constitutional rights." *Déjà Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.,* 274 F.3d 377, 400 (6th Cir. 2001) (citation omitted); *Spencer*, 347 F. Supp. at 538.  In particular, the public interest is served by ensuring that elections proceed in a manner that complies with constitutional requirements.  *See Hunter v. Hamilton Cnty. Bd. of Elections,* 635 F.3d 219, 244 (6th Cir. 2011) (finding that "[m]embers of the public . . . have a strong interest in exercising the fundamental political right to vote" and that "[t]hat interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful") (internal quotation marks and citations omitted); *NAACP-Greensboro Branch v. Guilford Cnty. Bd. of Elections*, No. 1:12CV111, 2012 U.S. Dist. LEXIS 34353, at *37 (M.D.N.C. Mar. 14, 2012) ("This court finds that the public interest in an election . . . that complies with the constitutional requirements of the Equal Protection Clause is served by granting a preliminary injunction"); *Perry v. Judd*, No. 3:11-CV-856, 2012 U.S. Dist. LEXIS 4290, at *36 (E.D. Va. Jan. 13, 2012) ("The public interest weighs heavily in favor of the plaintiffs. . . . [T]he public interest more closely lies with the voter's ability to cast a ballot for the candidate of her choice. This factor also weighs in favor of granting preliminary relief"); *Sw. Voter Educ. Registration Project*, 344 F.3d at 908 (explaining that "an abstract interest in strict compliance with the letter

20

of state law . . . is a less important public interest in the context of challenges to state law under the equal protection clause of the Fourteenth Amendment"). In this case, the public interest factor is therefore coextensive with the likelihood of Plaintiffs' success on the merits of their constitutional claim. *See Am. Civil Liberties Union v. McCreary Cnty.*, 354 F.3d 438, 463 (6th Cir. 2003) (stating that because the plaintiffs had demonstrated a likelihood of success of the merits of their constitutional claim, "the other three preliminary [injunction] factors follow in favor of granting the injunction"); *Mayhew v. Cohen*, 604 F. Supp. 850, 860 (E.D. Pa. 1984) (following the "constitutional procedures, which themselves balance the private and state interests at stake," means that success on legal claims will determine public interest factor in deciding motion for injunctive relief). Having established the likely illegality of the disparity created by Ohio's statutes, Plaintiffs have also established that the public interest is served by the issuance of a preliminary injunction preventing implementation of this unconstitutional scheme.

IV. **THIS COURT SHOULD ENJOIN DEFENDANTS FROM IMPLEMENTING AND ENFORCING LINES 863 AND 864 OF SEC. 3509.03 (I) IN HB 224, AS WELL AS THE SB 295 ENACTMENT OF OHIO REV. CODE § 3509.03 WITH THE HB 224 AMENDMENTS, AND SHOULD THEREBY RESTORE IN-PERSON EARLY VOTING ON THE THREE DAYS IMMEDIATELY PRECEDING ELECTION DAY FOR ALL ELIGIBLE OHIO VOTERS**

Plaintiffs seek a preliminary injunction narrowly tailored to prevent arbitrary and disparate treatment of voters and an impermissible burden on the right to vote in the upcoming election. Plaintiffs' requested injunction prohibits Defendants, their respective agents, servants, employees, attorneys, successors, and all persons acting in concert with each or any of them, from implementing or enforcing lines 863 and 864 of § 3509.03 (I) in HB 224 and the SB 295 enactment of Ohio Rev. Code § 3509.03 with the HB 224 amendments. This requested relief

would restore in-person early voting on the three days prior to Election Day for all eligible Ohio voters.

Respectfully submitted,

/s/ DONALD J. McTIGUE
_____
Donald J. McTigue (0022849)
Trial Counsel
Mark A. McGinnis (0076275)
J. Corey Colombo (0072398)
McTigue & McGinnis LLC
545 East Town Street
Columbus, Ohio 43215
Tel: (614) 263-7000
Fax: (614) 263-7078
dmctigue@electionlawgroup.com
mmcginnis@electionlawgroup.com
ccolombo@electionlawgroup.com

Attorneys for Plaintiffs
Robert F. Bauer*
Perkins Coie
700 Thirteenth Street, Suite 600
Washington DC 20005
Tele: 202-434-1602
Fax: 202-654-9104
RBauer@perkinscoie.com

*General Counsel for Plaintiffs Obama for
America and the Democratic National
Committee*

Jennifer Katzman*
Obama for America
130 East Randolph
Chicago, IL 60601
Tele: 312-985-1645
jkatzman@barackobama.com

*National Voter Protection Counsel
for Plaintiff Obama for America*

22

* Motions for Admission *Pro Hac Vice* forthcoming

### Certificate of Service

The undersigned counsel hereby certifies that the foregoing Motion has been served upon counsel for the adverse parties herein via electronic mail this the 17th day of July 2012:


Damian Sikora
Ohio Assistant Attorney General
dsikora@ohioattorneygeneral.gov

Betsy Schuster
Chief Counsel, Ohio Secretary of State Jon Husted
bschuster@ohiosecretaryofstate.gov


/s/ MARK A. McGINNIS
_____
Mark A. McGinnis (OH 0076275)

23