IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Obama for America, *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Case No. 2:12-cv-636 |
| | : | |
| vs. | : | |
| | : | |
| Jon Husted, et al., | : | Judge Economus |
| | : | |
| Defendants. | : | Magistrate Judge King |

**DEFENDANTS' MEMORANDUM CONTRA PLAINTIFFS'
MOTION FOR PRELIMINARY INJUNCTION**

**I.  Introduction**

"Unfortunately, throughout history military personnel have been prevented from … [exercising their right to the franchise] due to both procedural and logistic hurdles, resulting in their franchise being effectively 'hollow.'" *Military Voting and the Law: Procedural and Technological Solutions To The Ballot Transit Problem*, R. Michael Alvarez, *et al.,* 34 Fordham Urb. L.J. 935, 935 (2007).  The problem of how to allow those serving in the United States Military to cast a ballot has been with us since the time of our nation's war for independence.  *Id.* at 947.

Dating as far back as the Civil War, President Lincoln issued an executive order declaring a cessation of military operations in order to allow military personnel to travel home so that they could cast their ballots.  *Id.* at 948.   In order to make sure that those serving in the Civil War had access to the franchise, many states authorized elections officials to travel to units in the field to set up polling locations and to collect ballots from soldiers.  *Id.* at 950-51.

As recently as 2009, with congressional approval of the *Military and Overseas Voter Empowerment Act* ("MOVE Act"), the federal government has continued to recognize that because of the unique circumstances that apply, many military members and their families should be given particular consideration in the manner in which they can request, receive, cast and return absentee ballots.  *See, e.g.,* 42 U.S.C. § 1973ff *et seq.*

In Ohio, unlike in many other states, any registered voter may request an absentee ballot and have it sent to his or her home address or any other address thirty-five days before the election. In addition, Ohio, again unlike many other states, has provided for in-person absentee voting thirty-five days before an election when a registered voter can appear at the board of elections or other location designated by the board, and simultaneously request and cast an absentee ballot.[1] This year, Secretary Husted is also mailing absentee ballot applications to every registered voter in Ohio (1) in "active" status, and (2) every registered voter in Ohio who voted in the 2008 presidential election as reflected in the Statewide Voter Registration Database, regardless of voter status.  Ohio Secretary of State Directive 2012-24.

Despite numerous options for casting a ballot, Plaintiffs challenge the right of *Uniformed and Overseas Citizens Absentee Voter Act* ("UOCAVA") voters, who have more difficulty receiving and casting a ballot, to have the option of voting that ballot in person at the board of elections in the three days leading up to an election. They bring this challenge despite the fact that they recognize that "[o]f course, overseas voters should be treated differently from non-overseas voters.  Indeed, UOCAVA itself represents a response to the special difficulties that

---

[1] For example, the State of Florida only allows in person early voting to begin ten days before the general election and end three days before the general election.  Fla. Stat. § 101.657(1)(d).  Alabama requires that the absentee ballot application be received at least five days before the general election and only allows a very limited group of individuals to cast absentee ballots.  Ala. Stat. § 17-11-3.  The State of New York only allows individuals who are absent from their county of residence, unable to appear in person at their polling location due to illness or physical disability, confined in jail awaiting trial, or other very limited circumstances to cast absentee ballots.  NY CLS Elec §8-400(1).  New York further specifies that the absentee voter must apply for his ballot at least seven days before the election.  NY CLS Elec. § 8-400(2)(d).

confront members of the military stationed away from their home counties and other overseas citizens.  It was enacted to facilitate absentee voting by a group of citizens who are often not present in the area in which they vote."  Plaintiffs' Memo In Support at 13.  Although the Plaintiffs purport to recognize that UOCAVA voters should be treated differently than non-UOCAVA voters, they then claim that such a distinction violates the Equal Protection clause and is unconstitutional.  However, federal courts have found no conflict between  specific provisions made for UOCAVA voters and the general rules applicable to non-UOCAVA voters.  As implicitly recognized in the Plaintiffs' filings, these two classes of voters, UOCAVA voters and non-UOCAVA voters are simply not similarly situated.  Since they are not similarly situated, the State of Ohio does not have to apply the same statutory requirements to each group so long as the State has a rational reason for treating them differently.

In this case, the Plaintiffs cannot establish that any Ohio statute at issue burdens the fundamental right to vote.  Indeed, as the Plaintiffs acknowledge, there is no fundamental right to in-person early voting.  Further, Ohio has a rational basis for treating UOCAVA voters differently than non-UOCAVA voters and such a treatment,  recognized in federal law and the laws of all fifty states, does not violate the Equal Protection clause.  As such, the Plaintiffs' request for a preliminary injunction should be denied.

**II.    Background**

Both federal and state laws govern absentee voting by military and overseas United States citizens. UOCAVA and the *Military and Overseas Voter Empowerment* ("MOVE") *Act* are federal laws enacted to protect the rights of United States citizens to vote in federal elections while they are serving in the military or residing overseas. 42 U.S.C. 1973ff (1986) and Subtitle H ("Military Voting") of Title V of the *National Defense Authorization Act for Fiscal Year 2010,*

Public Law 111-84 (2010). The Ohio General Assembly has incorporated those federal protections into the Ohio Revised Code and has extended them to state and local elections. *See* 2010 Am.Sub.H.B. No. 48 and 2011 Am.Sub.H.B. No. 224 . Under Ohio law, the following voters are UOCAVA voters:

- A uniformed services voter, including:
    - A member of the active or reserve components of the U.S. Army, Navy, Air Force, Marine Corps, or Coast Guard;
    - A member of the National Guard and the organized militia who is on activated status
    - A member of the merchant marine, the commissioned corps of the Public Health Service or the National Oceanic and Atmospheric Administration; or
    - A spouse or dependent of any of the above.
- An overseas voter, including:
    - A person who is considered by Ohio law to be a resident of the state, but currently is living outside the U.S. Before leaving the U.S., the voter was last eligible to vote in Ohio or would have been eligible to vote in Ohio had he or she been 18 years of age or older.
    - A person who was born outside the U.S., but who has a parent or guardian who last resided and was last eligible to vote in Ohio before leaving the U.S.

ORC 3511.01

### A. Comparing the laws related to UOCAVA voters and non-UOCAVA voters.

Because military and overseas voters face more challenges than non-UOCAVA voters when casting a ballot, federal law including UOCAVA and the MOVE Act prescribes

accommodations specific to those voters. Similarly, Ohio law generally addresses UOCAVA voters separately in different chapters of the Ohio Revised Code (ORC Chapter 3509 for non-UOCAVA voters and ORC Chapter 3511 for UOCAVA voters). Below are a few of the ways that UOCAVA voters are treated differently from non-UOCAVA voters.

    1.    **Requesting an absentee ballot**

        a.    **UOCAVA Voter**

- Federal law prescribes the Federal Post Card Application ("FPCA") and allows it to serve both as a voter registration form if the voter is not already registered or needs to update his or her registration *and* a request for absentee ballots. 42 U.S.C. 1973ff(b)(2).

- If a UOCAVA voter applies for an absentee ballot using an FPCA, that request is a request for an absentee ballot for every election in that year, unless the voter specifically notes that he or she is requesting a ballot only for a single election in the year. ORC 3511.02.

- Relatives of UOCAVA voters may apply for absentee ballots on the UOCAVA voter's behalf if the UOCAVA voter is already registered to vote. ORC 3511.02(C).

- A UOCAVA voter may submit an FPCA by mail, email, or fax. 42 U.S.C. 1973ff-1 (a)(6)(A), ORC 3503.191(B), and ORC 3511.021(A)(2).

- An application delivered in person to the office of the board of elections must be received by the close of polls on Election Day. ORC 3511.10.

        b.    **Non-UOCAVA**

5

- If a non-UOCAVA voter requests an absentee ballot, but is not registered, the voter will not receive an absentee ballot without properly completing a separate voter registration form. ORC 3509.03.

- A non-UOCAVA voter can only apply for one absentee ballot at a time. ORC 3509.03(F).

- A non-UOCAVA voter may request the non-UOCAVA absentee ballot only for himself.  A person may request a non-UOCAVA ballot for a relative.  ORC 3509.03.

- A non-UOCAVA voter may only request an absentee ballot by mail or in person. ORC 3509.03.

- An in-person absentee ballot application must be received by 6:00 pm on the Friday before the election. ORC 3509.03.

   2. **Transmitting Absentee Ballots**.

      a. **UOCAVA**

- UOCAVA voters may receive absentee ballots by mail, email, fax, or in person. 42 U.S.C. 1973ff-1 (a)(6)(B) and ORC 3511.04.

- On the 45th day before each election, each county board of elections must transmit an absentee ballot to every UOCAVA voter who has filed a valid application with the board as of January 1st of that year or 90 days before the election, whichever is earlier. 42 U.S.C. 1973ff-1 (a)(8) and ORC 3511.04(B).

      b. **Non-UOCAVA**

- Non-UOCAVA voters may receive absentee ballots only by mail or in person.  ORC 3509.05.

6

- On the 35th day before each election, county boards of elections must have ballots ready for non-UOCAVA absentee voting. ORC 3509.01.

### 3. Returning Absentee Ballots

#### a. UOCAVA

- A postmark is not necessary in order for a UOCAVA ballot to be counted. If a voted UOCAVA ballot is received by the board within ten days after the election, it shall be counted—regardless of whether it contains a timely postmark, a late postmark, or no postmark—as long as the voter signed the identification envelope no later than 12:01 a.m. on the date of the election. ORC 3511.09 and ORC 3511.11(C).

#### b. Non-UOCAVA

- A postmark prior to Election Day is necessary in order for a non-UOCAVA absentee ballot to be counted. ORC 3509.05(B).

### 4. Centralized Ballot Tracking System

#### a. UOCAVA

- The Centralized Ballot Tracking System allows UOCAVA voters to track the status of their absentee ballots so that they may determine whether applications and/or ballots have been received by Ohio election officials. 42 U.S.C. 1973ff-1(h) and ORC 3511.021(B).

#### b. Non-UOCAVA

- The law does not provide non-UOCAVA voters with a method for tracking receipt of applications and/or ballots.

**B.  Amended Substitute House Bill 224**

Amended Substitute House Bill 224 received unanimous, bipartisan support in both the Ohio House and Senate and was signed by the Governor on July 27, 2011. The new law made changes to election administration, particularly in regard to absentee voting by uniformed services and overseas individuals. The law took effect on October 27, 2011 and included the provision at issue here which allows UOCAVA voters to cast an in person UOCAVA ballot for the three days before the election.

### III. Law and Argument

#### A. Standard of Review

Before granting a preliminary injunction, the Court must examine four separate factors: (1) Whether the movant has a "strong" likelihood of success on the merits; (2) Whether the movant would otherwise suffer irreparable injury; (3) Whether issuance of a preliminary injunction would cause harm to others; and (4) Whether the public interest would be served by the issuance of a preliminary injunction. *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (en banc). The standard for granting a preliminary injunction is more "stringent" than that required for summary judgment. *Leary v. Daeschner*, 228 F.3d 729, 739 (6th Cir. 2000). This is because "the preliminary injunction is an 'extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *Id.* (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1991)) (internal quotations omitted). In this case, the Plaintiffs have failed to meet the requirements for a preliminary injunction and this Court should reject their motion.

The party seeking a preliminary injunction must establish its case by clear and convincing evidence. *Damon's Rests., Inc. v. Eileen K Inc.*, 461 F. Supp. 2d 607, 621 (S.D. Ohio

8

2006 Aug. 30, 2006), *aff'd*, 461 F. Supp. 2d 607 (S.D. Ohio, Nov. 13, 2006) (citations omitted). To meet its burden, the movant's evidence "must more than outweigh the [opposing] evidence," but must also "persuade the court that its claims are highly probable." *Id.*  Plaintiffs here have not come close to meeting this high burden of proof.

Additionally, courts must apply a presumption in favor of a statute's constitutionality. See *National Federation of Independent Businesses v. Sebelius*, 2012 U.S. LEXIS 4876 (June 28, 2012) (citation omitted) ("every reasonable construction must be resorted to, in order to save a statute from unconstitutionality").

> **B.  Plaintiffs do not have a strong likelihood of success on the merits because UOCAVA voters and non-UOCAVA voters are not similarly situated.**

All parties to this litigation agree that the right to vote is the most precious of all rights of citizenship and that it serves to preserve all of our other rights. Yet that does not mean that the State is powerless to regulate voting hours and days or to classify voters into different categories complete with different regulations if those voters are not similarly situated.  "The Equal Protection Clause protects against arbitrary classifications, and requires that similarly situated persons be treated equally." *Coleman v. Bowerman*, 2012 U.S. App. LEXIS 6871 at *4 (6th Cir. Apr. 4, 2012) (internal citations omitted).  In analyzing equal protection claims in the elections context, courts have recognized that it is incumbent upon the plaintiff to establish that the two groups are, in fact, similarly situated. *Van Sustern v. Jones*, 331 F.3d 1024, 1027 (9th Cir. 2003).

The United States Supreme Court has recognized that a state may treat voters differently without running afoul of the Equal Protection clause. *McDonald v. Board of Election Commissioners of Chicago* 394 U.S. 802 (1969). In *McDonald,* the Supreme Court was faced with a challenge to Illinois' absentee ballot statute.  The Illinois statute at that time greatly

9

limited who could obtain and cast an absentee ballot. Illinois only provided absentee ballots for four classes of voters:

- Those who were absent from their county of residence for any reason whatsoever;

- Those who were physically incapacitated and obtained medical evidence to substantiate the claim;

- Those who could not go to the polls because of the observance of a religious holiday; and

- Those who were serving as poll watchers in precincts other than their own.

*Id.* at 803.

Plaintiffs challenged the law as limiting their ability to vote while offering certain classifications of voters broader access. The United States Supreme Court rejected this argument, finding that "there is nothing in the record to indicate that the Illinois statutory scheme has an impact on the appellants' ability to exercise the fundamental right to vote." *Id.* Thus, despite the *McDonald* Plaintiffs' claim that the Illinois statute interfered with the right to vote, the Supreme Court recognized that the statute only impacted a claimed right to receive an absentee ballot. *Id.*

The Supreme Court noted that "the absentee statutes, which are designed to make voting more available to some groups who cannot easily get to the polls, do not themselves deny appellants the exercise of the franchise; nor, indeed, does Illinois' Election Code so operate as a whole, for the State's statutes specifically disenfranchise only those who have been convicted and sentenced, and not those similarly situated to appellants." *Id.* at 807-08.

The Court determined that a rational basis standard would be the appropriate standard to use because Illinois had not done anything to preclude any individuals from voting. *Id.* at 808. The *McDonald* Court stated that those statutes would be a violation of the Equal Protection clause only if there was no reasonable relationship to a legitimate state end. *Id.* Furthermore, the

10

Court noted that legislatures are presumed to have acted constitutionally "even if source materials normally resorted to for ascertaining their grounds for action are otherwise silent, and their statutory classifications will be set aside *only if no grounds can be conceived to justify them.*" *Id.* citing *McGowan v. Maryland*, 366 U.S. 420 (1961); *Kotch v. Board of River Port Pilot Commissioners*, 330 U.S. 552 (1947); *Lindsey v. National Carbic Gas Co.*, 220 U.S. 61 (1911)) (emphasis added). Thus, "Constitutional safeguards are not thereby offended simply because some prisoners, as a result, find voting more convenient than appellants." *Id.* Finally, the Court noted that at that time, "all States make provisions for the Armed Forces, either expressly or impliedly." *Id.* at 810 n. 9.

The Supreme Court has emphasized that so long as a state's laws do not result in a situation whereby those who are legally allowed to vote are prohibited from using an absentee ballot and have *no alternative means* of voting, the State is acting in a constitutional manner. *O'Brien v. Skinner*, 414 U.S. 524, 530 (1974). The Court has recognized that States do not constitutionally have to allow no-fault absentee balloting. They simply have to provide an alternative mechanism to cast a ballot for individuals who absolutely cannot vote on Election Day. Ohio has gone well beyond this constitutional baseline by allowing not only no fault absentee balloting but also allowing absentee voters to cast ballots at the county boards of elections or at an alternative location selected by the board of elections until the Friday before election day.

The Supreme Court is not the only Court to reject an Equal Protection attack to a statutory scheme that allows some voters to cast absentee ballots, while not allowing other voters to do the same. In *Griffin v. Roupas*, 385 F.3d 1128, 1129 (7th Cir. 2004), the Seventh Circuit was again faced with a challenge to Illinois' absentee ballot statute. At the time *Griffin* was

11

decided, Illinois allowed individuals to cast an absentee ballot if they expected to be absent from their county of residence on Election Day, could not vote in person due to a physical infirmity, religious observation, attending college outside of the home precinct, serving as an election judge outside of the home precinct, or being sequestered as a juror. The *Griffin* case was brought by individuals who claimed that they were not entitled to an absentee ballot, but faced a hardship in getting to the polls on Election Day. The Seventh Circuit noted that "at bottom the plaintiffs are arguing that the Constitution requires all states to allow unlimited absentee voting, and the argument ignores a host of serious objections to judicially legislating so radical a reform in the name of the Constitution." *Id.* at 1130. The Court rejected the Plaintiffs' Equal Protection claim. It found that "unavoidable inequalities in treatment, even if intended in the sense of being known to follow ineluctably from a deliberate policy, do not violate equal protection." *Id.* at 1132.

A separate Equal Protection claim was brought against UOCAVA and rejected by the Second Circuit. Following the reasoning in *McDonald*, the court in *Romeu v. Cohen* specifically addressed whether UOCAVA violated Equal Protection because UOCAVA provides presidential voting rights to former residents of States residing outside the United States but not to former residents of States residing in Puerto Rico, a U.S. territory. *Romeu v. Cohen*, 265 F. 3d. 118 (2nd Cir. 2001). The court found that the fact that people who had relocated to Puerto Rico were not UOCAVA voters and were treated differently under federal and state law did not violate the Equal Protection Clause. In finding no Equal Protection violation, the court pointed out that but for UOCAVA, "citizens who move outside of the United States, many of whom are United States military service personnel, might be completely excluded from participating in the election of governmental officials in the United States." *Id.* at 124-125.

It is also important to note that courts have recognized the distinctions that exist between UOCAVA voters and non-UOCAVA voters. In *Bush v. Hillsborough County Canvassing Bd.*, the court emphasized that UOCAVA voters "do not enjoy the individualism which they serve to defend for all other citizens. How and where they conduct their lives is dictated by the government. The vote is their last vestige of expression and should be provided no matter what their location." *Bush*, 123 F. Supp.2d 1305, 1307 (U.S. District Ct., N.D. FL, 2000). Accordingly, the court acknowledged that "[f]or the members of our military, the absentee ballot is a cherished mechanism to voice their political opinion." *Id*. Similarly, in *Doe v. Walker*, the Maryland District Court addressed the deadline by which UOCAVA ballots could be received by mail. In extending the deadline for receipt, the court recognized the unique circumstances that UOCAVA voters face: "[U]nlike domestic absentee voters who may request an absentee ballot because it is inconvenient or difficult for them to vote at a polling station, military personnel deployed overseas lack the ability to vote in person. Voting by absentee ballot provides these men and women with their only meaningful opportunity to vote in state and federal elections while they are deployed abroad." *Doe v. Walker*, 746 F.Supp.2d 667, 679 (U.S. Dist. Ct. MD, 2010). Because UOCAVA and non-UOCAVA voters are not similarly situated, states have a rational basis for accommodating UOCAVA voters because of their unique circumstances.

Just as there is a rational basis to permit accommodations for the mailing and receipt of UOCAVA ballots, the Ohio General Assembly has a similar rational basis to allow UOCAVA voters the opportunity to cast an absentee ballot in person at the board of elections during the last weekend before Election Day while not extending that same deadline to others. The Ohio General Assembly recognizes the nature of deployment, which can happen abruptly and unexpectedly. For instance, members of the National Guard can be called up to active duty in

13

order to respond to disasters, whether manmade or natural. These call-ups can occur at a moment's time without any warning.

As initially noted, from the beginning of our Republic, military voters have had special problems in obtaining ballots and casting them. Ohio's laws, allowing UOCAVA voters the ability to cast an absentee ballot after the time during which non-military and domestic voters may do so has closed, rationally recognizes the unique circumstances that military voters may face. The General Assembly has provided a statutory scheme that accommodates that possibility.

### C. The balance of the harms weighs against granting a preliminary injunction because there is no constitutional violation and voters have many opportunities to exercise the franchise.

The Sixth Circuit has recognized that "[a]lthough no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal [to a request for a preliminary injunction]." *Gonzales v. National Bd. of Med. Examiners*, 225 F.3d 620, 625. (6th Cir. 2000).

#### 1. The Plaintiffs will not suffer any irreparable injury absent an injunction.

As demonstrated above, the Plaintiffs have failed to show that they are likely to prevail on the merits of their Equal Protection claim. That, in and of itself, is fatal to their request for a preliminary injunction and is a sufficient reason to deny the motion. In their motion for a preliminary injunction, the Plaintiffs erroneously presuppose that they have shown a constitutional violation. Since no such constitutional violation exists, by the Plaintiffs own argument, they have failed to meet the other factors for a preliminary injunction.

The Plaintiffs cannot demonstrate any irreparable harm absent an injunction. Their argument of harm is premised upon a claim that their constitutional rights are being violated.

Courts have recognized that a Plaintiff would suffer irreparable harm in the absence of an injunction *if* the injunction prevents an unconstitutional statute from being enforced. *See, e.g., Overstreet v. Lexington-Fayette Urban County Government,* 305 F.3d 566 578 (6th Cir. 2002). However, if the Plaintiffs fail to show an unconstitutional infringement of their rights, they are not entitled to a presumption of irreparable harm and must affirmatively prove such harm. *Id.* In this case, the Plaintiff does not even attempt to make such an argument. Since the Plaintiffs have failed to demonstrate any type of irreparable harm, this factor is not met.

Moreover, Ohioans have numerous opportunities to vote. The United States Supreme Court has recognized that "[a]n interest in making a later rather than an early decision is entitled to little weight." *Burdick v. Takushi*, 504 U.S. 428, 428-429 (1992). That is exactly the burden that Plaintiffs argue. Specifically, Plaintiffs argue that "the ability to vote in person on one of the earlier weekends [of in person absentee voting] is not a meaningful alternative for those who wish to vote later…" (Motion for Preliminary Injunction, p. 17.). They do not reference the option of simply requesting and voting an absentee ballot and mailing or personally delivering that ballot back to the board.

As Plaintiffs recognize, in 2005, the Ohio General Assembly created "no-fault" absentee voting allowing anyone to request an absentee ballot. ORC 3509.02. Previously, in order to receive an absentee ballot, a voter had to meet certain requirements. Absentee ballots are mailed to non-UOCAVA voters beginning 35 days before the election. ORC 3509.01. Voters can cast their ballot at home, day or night, as long as the ballot is received by 7:30 p.m. on Election Day or postmarked the day before the election and received by the board of elections by the tenth day after the election. ORC 3509.05(B). For the November 6, 2012 General Election, the Secretary of State's Office will mail absentee ballot applications to (1) every registered voter in Ohio in

15

"active" status, and (2) every registered voter in Ohio who voted in the 2008 presidential election as reflected in the Statewide Voter Registration Database, regardless of voter status. (Ohio Secretary of State Directive 2012-24).

In addition, in 2005 the Ohio General Assembly created in-person absentee voting beginning the 35th day before an election. During in-person absentee voting, voters can vote at the board of elections or other designated location. In 2011, the General Assembly unanimously passed Am.Sub.H.B. 224 that ended in-person absentee voting for non-UOCAVA voters at 6:00 pm the Friday before Election Day. ORC 3509.03.

Voters have voted in two elections with that rule in place without incident. Additionally, before 2011, there were no uniform standards for weekend hours before Election Day.  There is no reason to believe that with all the options available to a voter, those few hours on the Monday before an election are the only opportunities for non-UOCAVA voters to cast a ballot.

No court has ever held that each voter must have an opportunity to vote whenever and wherever the voter wants. However, in Ohio, voters have numerous options on how and when to vote: absentee by mail starting 35 days before the election, in-person absentee, and at the voter's polling location on Election Day. These options, absent the possibility of a few more hours, do not harm anyone and the Plaintiffs have failed to show that they or their voters, will suffer any injury absent an injunction.

### 2.    The Defendants and the public interest will be greatly harmed if this Court issues an injunction.

The Plaintiffs have also failed to show that the State would not be harmed if an injunction is issued.  The Plaintiffs again premise their argument on the belief that the statute at issue is unconstitutional.  Since, however, the statute is constitutional, the State will suffer a great harm if an injunction is issued.  As the Sixth Circuit has found, "the State's interest in not having its

16

voting processes interfered with, assuming that such processes are legal and constitutional, is great." *Summit County Democratic Central & Exec. Comm. v. Blackwell*, 388 F.3d 547, 551 (6th Cir. 2004). Furthermore, a State suffers an irreparable harm "in its ability to execute valid laws, which are presumed constitutional, for keeping ineligible voters from voting." *Northeast Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1011 (6th Cir. 2006). Since the State laws at issue in this case are constitutional, the same harm to the State that the Sixth Circuit recognized is present here.

Additionally, as demonstrated above, boards of elections are very busy trying to prepare for elections, which is especially true in the last three days before the election when boards need to make sure that each polling location will have sufficient supplies and accurate registration lists to conduct an election.

Ohio law mandates that each polling location has sufficient ballots, instruction cards, registration forms, poll books, tally sheets, writing implements, and other supplies necessary for the casting and counting of ballots. RC 3501.30(A). In addition, a polling location needs sufficient provisional ballots and provisional ballot envelopes. Each location also must have a large precinct map which is prominently displayed, all materials and postings to comply with federal or state law, a large United States flag displayed outside the entrance to the polling location during the time the polling location is open, and two smaller United States flags which must be placed 100 feet from the entrance of the polling location. RC 3501.30(A). Perhaps most important, the official list of registered voters must be accurately prepared for each precinct containing notations of those voters who have already requested an absentee ballot by mail or in person in order to prevent an absentee voter from also casting a regular ballot at the polls on Election Day. R.C. 3509.06(D). An injunction will interfere with their ability of boards of

elections to properly prepare voting locations, supplies, and registration lists during the most crucial time for Election Day preparation.

Finally, the public at large will suffer if this Court were to issue an injunction. An injunction allowing individuals to cast ballots that Ohio law otherwise would not allow is a great public harm. "There is also a strong public interest in permitting legitimate statutory processes to operate to preclude voting by those who are not entitled to vote." *Id.* at 1012 citing *Summit County*, 388 F.3d at 51. While the protection of constitutional rights is always a public interest, there has been no violation of constitutional rights here. Thus, the Plaintiffs have failed to show that they meet *any* of the prerequisites necessary for a preliminary injunction in this case.

## IV. Conclusion

For the foregoing reasons, this Court should deny the Plaintiffs' motion for a preliminary injunction.

Respectfully submitted,

MICHAEL DEWINE
Ohio Attorney General


*/s Richard N. Coglianese*
RICHARD N. COGLIANESE (00668300
MICHAEL J. SCHULER (0082390)
Assistant Attorneys General
Constitutional Offices Section
30 East Broad Street, 16th Floor
Columbus, Ohio 43215
614-466-2872 – telephone
614-728-7592 – fax
richard.coglianese@ohioattorneygeneral.gov
michael.schuler@ohioattorneygeneral.gov

*Counsel for Defendants*

## **CERTIFICATE OF SERVICE**

      This is to certify a copy of the foregoing was served upon all counsel of record by means of the Court's electronic filing system on this 1st day of August, 2012.

                                      */s Richard N. Coglianese*
                                      RICHARD N. COGLIANESE (0066830)
                                      Assistant Attorney General